Please all rise. Hear ye, hear ye, this Honorable Appellate Court for the 2nd Judicial District is now open. The Honorable Christopher M. Kennedy will present the case. Good morning, everyone. Please be seated. Your Honors, the only case on the docket this morning is 2-54-0364. The people of the State of Illinois plaintiff, Appellee, and Carlos J. Acosta defendant, Appellant. Arguing on behalf of the Appellant, Mr. Lucas Walker. Arguing on behalf of the Appellee, Ms. Laura Bidons. All right, good morning, Counsel. As you can see, our 3rd Justice is appearing remotely. Please make sure you speak into the microphone, Counsel, you may begin. Feel free to adjust the microphone as well. All right. May it please the Court, Counsel. Good morning, Your Honors. My name is Lucas Walker with the State Appellate Defender's Office. I represent Mr. Acosta in this appeal. Your Honors, this case turns on what Mr. Acosta knew at the end of his investigation and whether that amounts to a practical certainty that the life or health of the child is going to be endangered, meaning placed in peril of probable harm. The State failed to prove that, Your Honors. Even in the light most favorable to the State, it established nothing more than suspicions and concerns. Mr. Walker, would your client not have known a lot more about this case had he done some investigation? Well, I think it's undeniable that one would learn more if they did do more investigation, but I think the point to be made here is our argument is not that his investigation was sufficient or it was quality. Our argument is that regardless of the quality of the investigation, what he learned did not amount to a practical certainty that the child faced probable harm at home. Because what he learned or what he didn't learn, he didn't learn it because he didn't do the proper investigation. Isn't that correct? I mean, he didn't talk to the State's Attorney's Office. He didn't look at the prior sequence events. Shouldn't he have reached out to the former foster parents? I mean, he didn't put in place a safety plan that he could have done or an intact family services program, didn't give her any drug or alcohol testing when the whole issue behind this case was someone stole her Suboxone. No random drug testing, no temporary custody, nothing. So if he had done some of this investigation, taken a look at the A and B sequence cases, he would have learned a little bit more, and perhaps it would not have resulted in the death of a child. So with all due respect, when you say, with what my client knew, he wouldn't have known that child was going to die, it's because he didn't do the investigation to know. Isn't that true? Well, I think the danger in that type of analysis is that it risks diluting the mental state here from knowledge to one of negligence. In other words, sure, let's say there's plenty of things he didn't find out and he probably should have done more. But at the end of the day, the mental state at issue here is knowledge, and that's a practical certainty based on what he knew, that there was a peril of probable harm. So I think ultimately that just goes towards more of a negligent mental state, whereas here it is knowledge, it's a higher mental state. And look, the mental state is going to do a lot of work here, but it should. It should be easy to find somebody guilty of criminal knowing endangerment. And we'll stay true to do that here. His allowing the child's life to be in danger resulted in the child's death, didn't it? I mean, he allowed the child's life to be in danger by not doing any of the investigations, by not doing any of the follow-up as they requested at the hospital with a specialist. So as a result, you could call the mental state what it is, but as a result of his failing to follow up, he allowed the child's life to be in danger, which resulted in his death. Our argument is there was no practical certainty of endangerment. Based on what he knew, there is no practical certainty of endangerment. We can look at, for instance, the Bruce evidence, I think everyone could probably agree, is the most urgent evidence in the record. So the statement that Dr. Shannon Pence along with Mr. Acosta was that the child said that a dog caused the bruise on his hip. Then he said, well, it was caused by a belt by someone not in my family. And then he said, maybe mommy didn't mean to hurt me. And then he said the dog did it. Now, that raises valid questions. So then he takes the child to the hospital, and the doctor says, well, you really should take this child to Merritt, to a doctor who is a specialist in these injuries. Did he do that? No, he did not. He didn't take the child to a second exam. That's obvious in the record. But again, our argument isn't based on the quality of his investigation. It's based on what he knew, regardless of the quality of his investigation. And that statement in and of itself, while it raises suspicion and concerns, it doesn't raise a practical certainty of endangerment, where the statement itself indicates that the bruising may have been accidental. That's corroborated through the interactions of the mother and the child. Dr. Shannon and Officer Shipbaugh both testified that the child was not afraid of the mother, interacted normally with the mother. The analysis of the bruise itself from Dr. Shannon indicated that she had three options, moderate, severe, or mild. And she chose mild. I'd like to ask a question or two. I believe the way you phrase your defense is that virtual certainty relates to the, what I call, nonfeasance. And there's usually more than one way to look at almost anything. And one way of looking at it is, as you've described, there's another way of looking at it, which is if he had done the things that he should have done, the child would have been taken away from the mother. And from that flows the certainty that the mother wouldn't have killed the child. So what I'm suggesting to you is you're arguing that there has to be a direct causal link, as opposed to an interruption of the causal link or links that would have prevented the child's death at least via this woman, this mother that beat him to death. So how do you distinguish or how do you get around the fact that a reasonable person, I think, could conclude with certainty, and I'm not the trier of fact, the court below was. And I believe that court decided that had there been an investigation held in an appropriate manner, the child would have been removed from the custody of the mother. And that, I think, would be unless she showed up with a baseball bat or a gun or a knife and during the visitation she killed the child. I think it could be reasonably argued or concluded that there was a direct causal link. So try and convince me that my logic or my perception is wrong, please. I think that relies on assuming that there's protected. It kind of brings my mind to the juvenile neglect court proceeding testimony where it talks about if there had been protective action taken, they have these witnesses testifying that essentially if they were involved, no harm would have come to the child. But I think ultimately that's speculative, and I think it's undercut by other evidence presented at trial, which is where Welles even testified. Children are returned home during juvenile neglect proceedings. That occurs. Carol Ruzicka, the DCFS investigation expert, testified. Children die at all stages of even fully compliant investigations, even after protective action is implemented. So I don't think there's... Excuse me, counsel, but if this were a juvenile case, or if he would have put in place a safety plan, taken protective custody, put in place a safety plan, put intact family services, drug and alcohol treatment for mom, random drug testing, by taking temporary custody, mom could have maybe, maybe got a little bit better, and when the child is returned, the whole idea of juvenile, or child abuse and neglect court is to get the parent and the family intact, get them ready to take a kid so when they are released, they're not killed. So, I mean, I get what you're saying, but how is that speculative? How is it that the Juvenile Court Act is one of the oldest acts that we have in our state, and the reason being is to protect the child? So you're saying, well, the child might not have been protected anyway, even if this were happening. Shouldn't he have tried? Well, again, our argument is there wasn't any practical certainty of endangerment to require him to have done that. Now, to the extent there was information he did not seek out and obtain, that's a negligence standard. We're not doing negligence here. This is knowing. That's a high mental state. So before we can even get to the point where we're deciding whether or not, you know, protective action would have helped, well, you know, based on what we knew, there was no practical certainty of endangerment in the first place requiring that. So, you know, and also... He allowed the child's life to be endangered, which resulted in the death. Is it laziness, what he did? Absolutely. When he was at the sentencing hearing, didn't he admit that he screwed up, that he should have done more than what he did? Didn't he admit that at the sentencing hearing? I just don't recall it. I recall him saying essentially that he's not the uncaring monster he was portrayed to be and that he, you know, took responsibility for any part he played. But I think that's irrelevant to the point of what did he know at the time he closed the case and does that amount to a practical certainty that the child's health or life is going to be placed in danger? And ultimately, it was not. The, you know, more facts that even cut against that are other observations, such as the parents themselves, the caregivers doing the investigation with Mr. Acosta. Now, the mother was completely compliant, cooperative, not defensive. She tripped all over herself trying to get somebody to give her a drug test. That's not what she did in the B-sequence. In the B-sequence, she refused to take a urine sample. Here she's begging for one. Also, when she's told to take the child to get the examination to determine the cause of the bruise, she doesn't resist. She doesn't put it off or try to get out of it. She does so immediately. When there's a restriction placed on her and she's told you can't be alone with the child, the father has to come pick up the child. She has a protest. When the father comes to pick up the child, the nursing staff and Dr. Shannon testify. Well, Dr. Shannon testified. My red flag's on Dad. So the child's not afraid of the mom or the father. The father cooperated the next day. Mr. Acosta goes to the home. He's let in. No obvious risks or hazards. The environmental neglect claim goes nowhere. There's no practical certainty of a danger to the family. So there's countervailing evidence, but, you know, the trier of facts found the other way. But I'm more interested in the standard. You've said that the standard we're supposed to judge here is what he actually knew at the time. And so you're saying that's essentially what he wrote up in the C-sequence is what he was aware of, and that's the best evidence, really the only evidence that directly goes to what he knew. But to what extent should we consider a reasonableness standard or a reasonable person as opposed to what he actually knew at the time? I believe the standard is what he was consciously subjectively aware of. So I think we've got to put ourselves in his shoes and determine exactly what he knew and whether that meets that standard. What about the argument that he willfully ignored certain things or refused to do things that he was required to do? Again, I think that goes towards negligence. It's not a knowing mental state at that point. Again, I want to stress, like, we're not arguing that this investigation fully complied with all written policies or guidelines or that more could not have been done. Our argument is regardless of the lack of quality of the investigation, based on what he learned, there is no practical certainty of endangerment at the time that investigation was closed. So I think, you know, I think the trial court in the state, from my point of view, sort of understood that. And so they looked to the past, and they'll start to look to the prior DCFS C-sequence reports and the criminal history, and they'll paint it as this generally inherent dangerous environment that was just going to be endangering in some way or another. But that doesn't suffice either. Because those C-sequence reports, to the extent they were considered, were unfounded. Except for one, 2013, when she gave birth to a child without an abuse, but that was terminated successfully, and she entered treatment. But ultimately, those claims were investigated. No credible evidence of child abuse or neglect was determined to be present. I know the state will point out... Had he reviewed those C-sequence reports prior to letting the kid go? Well, the defense argued that he had at least reviewed the B-sequence, but the state insisted he did not. And that's based on the C-note, where it says, confirm details with Kathy Gold regarding her being passed out in the car. But children were not there, so there was no child abuse or neglect determined to be present. I wanted to point out in that B-sequence, because the state has pointed at some point there were bruises on the child's face, according to the reporter. But if you look at that B-sequence report, that was investigated. And the actual observation of the child by the investigator observed no signs of maltreatment, and the children appeared to be healthy and clean. So there's no escalation of violence. There's also no violence in the criminal history between the children and the parents. Now, Mr. Costin did not gather the criminal history. B-sequence report, mom was passed out behind a wheel with track marks. Right. Up her arm, correct? That's the B-sequence, right. Yes, that's the B-sequence. And you had the testimony, the state had the testimony of this Carol Ruzicka, who testified as an expert on behalf of DCFS in these cases. And she indicated the investigation was insufficient in what should have been done as a result. So, you know, what he did and what he should have done are two different things, correct? Correct. Go ahead. Go ahead. I'm sorry.  I guess I'm out of time here, but we would just reiterate that the state failed to prove a practical certainty of knowing endangerment at the time this case was closed, and this court should reverse the conviction outright. I want to ask you a question before you go.  You have a second issue about proximate cause. I wanted to give you a moment to address that. It indicates the four-month time period between the decision to close the case. Is it a decision to close the case or is it a decision to stop temporary custody? No, I'm under the impression it was the close of the investigation. All right. So at the close of the investigation, four months passed then before the murder? Correct.  And so is that your argument that the passage of time is the failure to prove proximate cause? That's merely one consideration. That's one consideration that makes it less foreseeable. But I think if I was going to sum up the proximate cause argument, I would get right to the heart of the matter and say at most, the defendant here furnished a condition. It wasn't an inherently dangerous act. He didn't shoot a gun in the air. You know, he didn't – the state's cases are distinguishable on that point. They cite the DUI, drug abuse, homicide, acts that predictably put lives at risk. And here, he made a judgment call. Even the testimony from Carol Ruzicka is clear on that. These are gray zones. He made a judgment call based on what he learned during the investigation, and based on that, at most, is furnishing a condition, not an inherently dangerous act that predictably puts people's lives at risk. So the Goldman principle comes into play. Does the statement prove foreseeability of death or just bodily harm? No. It is proximate cause of death, according to the statute. But at the end of the day, they don't have to show, as far as I'm concerned, they don't have to show the precise injury. But it does have to be the same type of harm. So I would argue it's lethal harm. This isn't – there has to be some proportionality. So, you know, a mild, non-diagnostic bruise, fully compliant parents, one parent determined to get a drug test, the father compliant, no red flags on dad, no violence between the children and the parents in the criminal history, sequence reports unfounded except for one, far removed from the current situation. That does not give foreseeability of lethal harm. And as we – we would just – you know, at most, he furnished a condition that the – subsequently an independent third party, the mother, took advantage of, caused intentional criminal harm to the child. She did – obviously, I want to point out for the record here, she murdered the child. She was convicted of it. She's doing time. And defendant did nothing more than furnish that condition, which, according to Goldman, does not amount to proximate cause. All right. Thank you, counsel. You'll have time. I have a couple of questions. Go ahead. I believe you said that he made a judgment call. Did you not? Just now? He did make a judgment call. When someone makes a judgment call, it's supposed to be based upon being fully advised in the premises. Would you agree with that? I mean, I don't suppose I've ever written that in an order. I'm sorry. What was that? I was taught that whenever you wrote an order for a judge as an attorney, you put in being fully advised in the premises. Yes. Okay. And so when you say this defendant made a judgment call, and the record is fairly, supports the fact that he wasn't fully advised in the premises. And if he had been fully advised in the premises, the child would have been taken away from the mother. So if there is a causal link, and it's based upon the fact that you do nonfeasance, why isn't this a crime if, in fact, like in Paul's graph, it is a reasonable foreseeability that what transpires, or at least is a question of fact, and the trial board found that there was a causal link, that but for his failure to do his investigations, the child would have been alive. Well, right away I would point out it's not just a but for standard, and based on what he knew, he's not an attorney. And the testimony from Carol Rozicka was that all these decisions, whether or not to let protective custody last. I'm not suggesting that the standard is whether or not a DCFS worker is a lawyer or not. I'm suggesting whether or not a competent DCFS worker, investigator, whatever, would have further investigated or followed through on the guidelines. Because if they don't, then what liability do they have, other than being fired for a violation of the rules? They have virtually no responsibility relative to the child, because if the guidelines and if what a reasonable person would do to determine whether or not the child was being battered isn't followed through, what does that say for the system? Does it say that, you know, you can sleep soundly at night because the government's fully aware of what's going on or not? Yes. I think, and your point's well taken, but I think in this situation, you know, the practical certainty of knowing the endangerment isn't there. Now, what would make this a situation where there might be, you know, more likelihood of him being held accountable in this way? It would require, I mean, it would require way more, there would have to be a second examination, there would have to be a practical certainty as to the cause. The state created about three DCFS, I'm sorry, child abuse experts. None of them could tell you what caused this. In fact, even Dr. Davis, the director of Merit, viewed the photos of the bruising and said, I can't say this was an accidental, I can't say this wasn't caused by a dog, and I can't even say this is highly suspicious or likely to be child abuse. They would need something that felt like of that nature where it was determined, hey, this is abusive, we've got to do more, and that would have to be ignored. I think that's where we'd have to go. And the parents would have to be defensive. There would have to be way more signs than we have here. At this point, based on what he knew, there just isn't a practical certainty of endangerment. The state can't establish the knowledge mental state. So are you now arguing the judgment was against the manifest weight of the evidence? No, this is a sufficiency of the evidence argument. And there was not enough here to establish knowledge, even though that was favorable to the state. The surrounding circumstances defeat that. Mr. Walker, the state, the DCFS had 48 hours from when the police took protective custody to determine whether or not to let the protective custody lapse, correct? I believe it's 48 hours. I think they could get extensions, but... But did your client do that? Did he let the 48 hours lapse? I don't believe so. I don't believe so. I think the protective custody lapsed at the police station after he let the mother go. The mother went to get the examination from the doctor. That's what I recall. But, again, I think I don't want to take up more time, but I would just say it seems like the argument is centered on the lack of quality of the investigation, but that's a different argument than, okay, regardless of how, you know, the quality of the investigation or lack thereof, what did he learn, and does that amount to knowledge? I would just leave with that, I guess. Can I leave you with this? Yes. Had he done a thorough investigation, would he not have learned more? Oh, I mean, I think he had, by necessity, if he would have done more, he would have learned more. There's no doubt about it. But I don't think that's the point of this case. Thank you, Your Honor. Thank you, Counsel. You only have time on rebuttal. Counsel, you may begin. May it please the Court. Counsel. Laura Guilan on behalf of the people. Defendant's argument concerns the sufficiency of the evidence, so the familiar common standard applies, and the evidence is viewed in the light most favorable to the people with deference to the trial judge's credibility determinations and reasonable inferences to be drawn from the evidence. The first issue is defendant's knowledge that A.J. would be endangered, and here the trial judge was the trial judge of fact, so we have specific findings of fact on the record, and the trial judge found that defendant falsified his reports, purposefully making material omissions of what the trial judge considered to be the very obvious facts of the case. So the trial judge found that defendant's reports were intentionally misleading. They did not reflect everything defendant knew. Instead, the sources of information he had were his own observations in light of his training as an advanced child protection specialist. The record reflects that he included in his C-series the B-series in the lead's report for the mother, and he stated that he discussed the B-series with the prior caseworker to review the details. The record also shows that Officer Schippau informed defendant of everything she learned in her investigation, and Dr. Shannon spoke to defendant repeatedly as well, and both of those witnesses testified that they told defendant certain information in the trial, in fact, those witnesses were credible. Is there any prior authority in the state of Illinois relative to a prosecution like this where a DCFS worker has been convicted of similar crimes? I believe this is the first case where a DCFS worker is the person doing the child endangering. The statute, but it fits fully within what the statute prohibits. So the statute prohibits knowingly causing or permitting a child's life or health to be endangered, and by virtue of his position as the advanced child protection specialist assigned to the case, he's the one person who is making the decisions in this case. They put him in a position to be able to permit the life or health of AJ to be endangered. Was there an indication by, I believe, a woman, DCFS worker, that said that she had quote-unquote screwed up and that she shouldn't have asked the child in front of the mother how the bruise occurred? Yes, so there was testimony from a police officer, Officer Schippau. She was the one who took protective custody of AJ, and she did tell the defendant that she shouldn't have asked in front of the mother, but the reason she shouldn't have asked in front of the mother was because the mother then leaned down and told the child, oh, Lucy did that, didn't she? So the mother suggested this dog cause of injury to the child, which is when she said the hairs on her arm stood up because she realized all of a sudden that the mother was... And after the admission by the other DCFS worker, did the defendant decide to remediate and to do anything to attempt to get an answer from the child either at the time or shortly thereafter within the window of his ability to take custody of the child? The... Mr. Acosta, I believe, asked the child maybe two questions at the police station in the presence of his brother without trying to establish any rapport first, and the child, I believe, told him at that point he might have said the dog did it. However, the dog explanation was obviously false, obviously false. The officer who first described the injury described it as being horrific, taking her breath away. She was shocked by it. It was purple, red, and yellow. It was 16 inches in length. It started on the front of the child's head. It went all the way back around to the back of his hip, up the side into his ribs. There's also some separations and scrapes along the side of it. So the officer happened to have that kind of dog. She said there's no way it was caused by a dog, and the trier of fact said that no one could believe this was caused by a dog. It's just... Counsel, the expert said it's not enough on its own to extend temporary custody. The bruise itself on its face was, quote, not a serious harm case. In and of itself, it did not support taking protective custody. That was the state's expert who said that. So are you saying that that would have triggered an automatic extension of temporary protective custody, the observation of that bruise? Well, we have more than just the observation of the bruise. We also have the fact that the mother is obviously lying about it. There's the mother trying to tell the child that it's the dog when it's obviously not the dog. The trier of fact found it's obviously not the dog. And then we have the child stating that the injury was inflicted by a belt and that maybe mommy didn't mean to hurt me, which the trier of fact viewed as a direct accusation by A.J. that his mother hit him with a belt. So there's also the doctor's form confirming suspected child abuse. After what she learns from talking to A.J., she fills out the confirmation of suspected child abuse form. She's not saying she thinks this is accidental. She thinks the word mild in ER emergency room terminology doesn't mean not significant traumatic injury. She said it's still a significant traumatic injury. It just didn't require emergency room treatment. But there's also the four factors that were noted and that defendant also would have known from his training and experience about the changing explanation of the injury. First she says it's a dog, then at the police station. I don't think the issue in the case is whether this judgment was good or the investigation was complete or was good in any sense. The question as the defense has framed it is what did he know subjectively? What did he actually know? And how foreseeable was that, that the mother would cause harm in this way? So I have a couple of questions on that. So the trial court actually in sentencing said that in this case the defendant has been convicted of reckless behavior which caused a death, which led to a death, and that was my finding during the case. So to what extent do we credit that remark on mental state? I don't recall that remark. I know that and I don't believe it was raised in a post-trial motion or as an issue in the brief. In general the child is presumed to properly know and apply the law and everyone argued knowledge. Everyone argued he needed to know that the child would be endangered. So I believe that maybe that was just a misstatement at that point as he did find that the danger to the child would have been known by Mr. Acosta. All right, so do you disagree with the defense formulation that knowledge is subjective at the time? I don't disagree that there's the subjective need to know that the child would be endangered. But it's fully met in this case with defendant's knowledge. There's not just the injury. There's the fact that the mother is lying about the injury. There's the fact that the mother is changing her story about the injury multiple times. There is also the instability in the home and the disgusting condition of the home, which Officer Shitbaugh fully informed defendant about. And it was also in the initial report, which would have been what he read before he even met with. Right, so there are red flags, obviously, all over the place. But to what extent they're saying this is a judgment call, and it was poor judgment, but it was nonetheless a judgment call. Is there any evidence that any of this automatically triggered extension of temporary protective custody? Well, I believe that what was known was supposed to trigger a meeting. It was supposed to trigger the CAC interview. It was supposed to trigger the merit investigation. It was supposed to trigger a meeting with the state's attorney and those other agencies. And had any of that been done, a petition would have been filed and the minor would have been removed from the mother's care. So I believe that... So do you believe, counsel, that his behavior was a material element and a substantial factor in the child's death? Yes, because he made the choice to... He made the decisions not to follow through. Not to follow through with all of the... He'd used MERIT before and he'd used the CAC before. He knew these agencies were there. He knew they were required. And he intentionally... The child judge found that he willfully failed to investigate. It's just not... It wasn't just, oops, I didn't know that I was supposed to do that. The child judge found it intentional so he wouldn't have to do more work. Well, sure, the intentional failure to investigate. But is that a crime? No. It's not a crime to fail to investigate. But the reason these pieces of investigation are required is because there was, based on what was known, the danger to the child was so obvious that you need to rule out that there's any harm. Because otherwise, the likelihood of harm is so high that the child is in obvious danger. So the doctor viewed the information as alarming. She viewed it as confirming suspected child abuse. She found it imperative to get a MERIT interview, a CAC interview. And if she thinks it's a dog, she's not going to think we need an interview. She's going to think this is a dog. You can send the child back to the mom. But instead, she's alarmed by it. So there's also the most significant piece is the injury, but there's also the mom apparent heroin relapse. She was described as looking like a heroin addict and looking strung out. She said that her boyfriend stole her Suboxone, which is a drug used by heroin addicts, and that he stole her phone. But officers located her boyfriend, and he said that they found that he didn't have any of her possessions on him and that he said that she stole his Suboxone. And she's brought the children in just diapers and T-shirts in the cold to this Taco Bell with no shoes, no pants, no coats, despite the cold, looking strung out. The house is absolutely disgusting. It smells terrible. There's urine and feces everywhere. And then he does have, unrounded or not, he still has reports of very similar disturbing conduct in the B-sequence, which included the mother being passed out in a car with fresh track marks on her neck, on her arms, on her feet, A.J. having odd bruising on his face. The children were dirty. Their clothing's inside out. They're guarded with their father. There's the mother's history of heroin abuse and opiate addiction, the father's prior domestic battery charges and history of drug abuse. The unfounded case, which the facts were that the mother neglected a 7-year-old foster child who was later removed from her custody and mental abuse. Her 11-year-old son had mental health issues. The child's bedroom was a dumping ground. There's calls to the police for domestic violence. And so these are facts that are reports that are very similar to what's being reported here. And so to believe that this mother, she says she's willing to get drug tested, but she's defending that a drug test hurt. So, you know, that's another thing he intentionally failed to do. So with all of this evidence, with the physical injury that the mother is lying about, and Devan's trained on how to evaluate credibility of people he talks to in investigations, and he's trained in how children can lie to protect their parents. And there's even in the P-300 specific training about how a belt injury can wrap around and be on multiple planes of the body. So the question about the P-300s, those are guidelines internal to DCFS, right? They're not laws or rules. I believe that is correct, Your Honor. So to what extent does that, I mean, certainly some of the guidelines derive from the rules and from the law. But there are cases, negligence cases, that say that failure to abide by guidelines is insufficient to prove negligence. Sure. I think that the role of the guidelines in this case was that he knew he needed to take these further investigatory steps based on what he did know. And the reason that those steps are required is because of the high likelihood of harm to the child. So when he knows that these requirements are there and intentionally, willfully fails to do them, that does bear on his knowledge. That he knows these things, but he's hiding them in his reports because he doesn't want to do more work. So when we're talking about things that should be done and are not done, typically we're talking about recklessness and negligence, right? And so the statute here requires knowledge, knowing, and that refers to a result, right? So what I'm struggling with here is to what extent are you asking for a result here that has any limiting principles whatsoever? Because if a DCFS worker is exposed to criminal culpability for a failure to comply with guidelines, that's a pretty broad net to cast, isn't it? Well, the people's position isn't that he was being held accountable for failure to follow guidelines. You can continue. Thank you, Your Honor. It's that he was held accountable for knowingly permitting the child's life or health to be in danger. And what he didn't know is not the... What he did know, he knew so much about this horrific injury and its explanations and the other instability, that what he did know did cause him to be subjectively, consciously aware of the probable harm to the child. And what he didn't know just reflected how his decisions, his choices not to further substantiate the harm he already knew about. That the child had shown was absolutely obvious. You're presuming that this person is sentient, are you not? Yes. Isn't the standard something in the nature of, would a reasonable person who has competent experience in this particular occupation done things that would have probably resulted in the continued existence of this child? In other words, what's the standard? Is it, did he actually know? Or is it, should a reasonable person have known? I believe the standard is that he had to know that the child would be endangered. So that is his subjective knowledge, that the child would be endangered. But his knowledge is only going to be heightened by the fact that he's an advanced child protection specialist who is trained in child abuse and suspicious signs of child abuse. And as I understand your argument, your argument is he had to know because the facts in their totality indicated that the mother was not telling the truth, the child was not telling the truth, and that this wound could not have been caused by a dog. And therefore, if there is only children and an adult parent and a dog, and a dog hasn't done it, then either this injury was caused by the children, which probably didn't happen, but it was caused by someone. Who was that? That was the mother. So by the process of elimination, this person should have known what happened. At least to the extent that he should have made further inquiry. Well, the trial judge found that it was an inherently dangerous situation that the child was thrust back into. And it's, the trial judge was able to make the reasonable inference of knowledge from the evidence. Because knowledge is usually proven by circumstantial evidence. And so that the facts known to him were sufficient to allow the trial judge to make that inference in this case. I think I wrote about 30 years ago that you don't, it's almost impossible to know what's in someone's head unless they admit what is in their head. So there has to be circumstantial evidence, inferences. Do you believe the record establishes the fact that this individual knew that the child was in jeopardy? Based upon the inferences that are to be drawn?  I have no further questions. Counsel, the standard is practically certain of a result. Is that correct? I think it's, he would have to know it was practically certain that the child would be endangered. All right. So, is, so there is a difference here. If the child is endangered and is either not harmed or harmed up to the point of death, is a misdemeanor. Whereas if the child dies, it's a felony. Shouldn't that have a different foreseeability standard? Well, the foreseeability under the people versus kid case, it does not require that the person charged with the crime foresee either the extent of the injury, such as a death, or the exact way in which it occurs. And where physical abuse in the home was the danger that defendant exposed the child to, the child's death was sufficiently foreseeable in this case. All right. So if there's physical abuse, that's enough. It was foreseeable in this case based on everything that was known. Had the defendant done the proper investigation, it would have certainly been foreseeable, correct? It was already foreseeable. It would have been made even more obvious. Yes, Your Honor. If there are no further questions, the people would ask that this Court affirm defendant's conviction and sentence. Thank you, Counsel. Thank you, Your Honors. All right. Mr. Walker, your rebuttal. Your Honors, you know, I think I just want to reiterate a few things. It's not obviously not a dog. Davis, the expert, testified he couldn't say it wasn't from a dog. You know, just because there are different reasons that are put out there as a possibility doesn't rule out any. He didn't do enough to rule out any. And therefore there was no knowledge of what caused it. Right? To the extent Dr. Shannon was in histrionics about the bruise, which admittedly was unsightly. It's an unsightly bruise. But her whole point was, I don't deal with this stuff. Like, this is beyond me. I don't really know what this is. She said it was beyond her and told him to take the child to a specialist, what's it called, Metro or something, to make that determination. Did he do that? No, he didn't get a second exam. So my point is this, and I understand what you're saying with respect to the standard. But my point is this, if any DCFS worker, as Justice McLaren said, decides not to do a full investigation and something happens, then they can say, well, he didn't know this was a possibility. But had he done a full investigation, he certainly would have known that this were a possibility. And he didn't. He dropped the ball. So how are we to figure out what the standard is if he knew or he should have known based upon doing further investigation? I mean, the state's attorney's office said, had he come to us, we would have recommended, you know, protective custody. They would have filed a petition on the child. DCFS never called the state's attorney's office. The state's attorney's office was familiar with this family, and they would have taken protective custody. So the fact that he did nothing to save the child's life, how does that exonerate him? That presupposes that he would have reason to believe the child's life was endangered. He didn't. That's a mild non-diagnostic bruise. And Dr. Shannon's suspicions of child abuse are based on her opinion, which she admittedly puts out there, I'm not familiar with this stuff. He should have had an expert do it. I don't know. It just kind of looks scary to me, basically. I appreciate that, Mr. Walker, but the bruise is not the only thing here. There was a lot of other things here that he dropped the ball on. So you can focus on the bruise, but the bruise is not the only thing he should have seen, correct? Well, I think the bruise was the main – I mean, the environmental neglect claim went nowhere. To the extent if it was cleaned up, if it was dirtier before, the bottom line is his knowledge was that there were no obvious risks or hazards. The criminal history shows no violence between the parents and the children, not that he gathered it, but that was a dearth of knowledge. The DCFS sequences were investigated and unfounded. The only one that was indicated was far removed when the child gave birth. Even if you were to look at the criminal history and say, well, there was a supervision imposed for a domestic that was reduced to battery in 2013, that started in January. The child was born in October. So there was nothing even remotely concerning regarding violence. It was before the child's birth. So I don't really think there are any other – the concern is the bruise, in my opinion. Everything else, though, she has a history of heroin abuse, sure. People have a history of drug problems, and people who are on Suboxone are trying to treat it. So when the state says, well, that's a drug for heroin addicts, that's a drug for heroin addicts who are trying not to be heroin addicts. So she's doing her – I'm not saying what – I can't speak certainly, but the evidence demonstrates she's doing her due diligence in trying to stay on that and willingly pushing to get a drug test. So I don't – to your point, I wouldn't sit here and concede there's anything other – any other factors that are concerning as the bruise. And the bruise was mild and non-diagnostic. It's unsightly, but that's the truth. I have a question or a comment that I'd like you to respond to.  The fact that the bruise wasn't analyzed with the appropriate specificity and medical expertise, when you combine it with what appears to be an attempt to obfuscate or to cover up how the wound occurred, that, based upon my adult life, would suggest that there is something amiss here. As Justice Shostak referenced, it's not just the wound and what caused the wound. It's the response of the mother to suggest that it should be treated with suspicion and there should be further inquiry. I don't expect any DCFS worker to be a medical expert to determine whether or not that was caused by a dog or a gerbil or a vicious cat. It's what happened in the totality of the circumstances. And the totality is, based upon her responses, this wasn't a dog, and if it isn't a dog, then it's got to be something or somebody in the home other than the child, which means that this individual had facts that were available to him that if he had exercised reasonable caution and acted as a reasonable person, there would have been further inquiry. And as Justice Shostak and I think some of the experts said during the trial, the child would not have been allowed to remain with the mother. And so I would like you to respond to my argument or my analyses of why there should have been more done by this individual. Why there should have been more done? Further inquiry. Well, I would just say he did what he did. And our position here is not to lay out all the things he could have done or should have done. It's not a negligence case. Our position is, based on what he did do, and we're going to lay on the mental state a lot. Well, it is a negligence case to the extent that negligence is a form of mental logic or analyses, and it can be either negligence, it could be willful and wanton, it could be so reckless. It could be intentional in the sense that it could be laziness or a desire not to fulfill his fiduciary duties to the child and to the state of Illinois as guardian of its offspring, so to speak, its children. So you cite the negligence. There are other levels here. And I'd like you to address how the other levels haven't been realized or effectuated. Well, I think what I would say is to the extent it's brought up as far as, you know, he would understand that he should have done more in knowledge of what he should have done equals knowledge of this certainty of harm. I think that misses one step in there because just knowing you should have done something doesn't deliver to you the knowledge you would have gained from having done it. So just know, well, let's say we should get a second exam, but he doesn't do it. That doesn't inform him of what that second exam would have delivered. So it doesn't increase knowledge on the pertinent fact, which is whether that child faced a practical certainty of harm and endangerment at home. And, you know, we would point out DCFS removes children as a last resort. There has to be an urgent and immediate necessity for removal. And they expect minimal parenting standards. So, you know, when you view all this in the proper context of the... That doesn't matter. That doesn't mean that we just have to become complacent because DCFS has always done, in your opinion, an insufficient job. Oh, it takes a lot to remove a child. Maybe it shouldn't take a lot to remove a child. Maybe if somebody does their job and investigates it, they might find that there is an issue there, and they don't just rely back on, oh, well, this is the way DCFS always conducted itself, so I may as well conduct myself the same way. You know, we as parents, if your child is injured in daycare, you go into daycare jumping and screaming. But when DCFS goes in, they don't have an obligation to be as upset about mistreatment of a child? Oh, he was fired from his job. He could be, you know, there's civil ramifications, and if he ignored... If there were facts here that demonstrated a practical certainty of knowledge, he'd be criminally responsible. The fact is there's not. It's not. There's not enough here to demonstrate a practical certainty of knowledge, and I think we're all swimming around that and trying to find... Madam Counsel, my response to you is he would have had a practical certainty of knowledge had he done an investigation, as opposed to have done half of an investigation, or a third of an investigation, or had thought, hey, I've got some stuff to do. I don't have time to follow through with this case. I'm just going to terminate the protective custody prior to 48 hours because I don't feel like doing any more research on this case. I don't feel like doing anything further on this case. So that's the complacency that you are submitting DCFS has always had, and therefore we're supposed to look at that and accept that as the standard for children in our state and in our country who happen to be in dangerous familial relations or in dangerous homes? So we're just supposed to be complacent about it? I don't buy that. I don't buy that one bit. I mean, there was a material element and a substantial factor in that child's death. Had he done his job? His job that he lost. I appreciate that. But why shouldn't there be other consequences for his actions other than just the loss of a job? Well, I think you said it in your statement where had he done more, perhaps there would have been a practical certainty of knowledge, but he didn't. So there's not a practical certainty of knowledge here, and that's the standard. That's what we're dealing with in this appeal. As far as policy guidelines and what else DCFS should do, that's beyond this case. My argument here is that they did not establish knowledge. I agree with you it's beyond this case, but you said it out there almost like it's a fait accompli. Oh, this is what DCFS does, therefore we have to follow what DCFS does. I don't buy that. We all come to work every day to do 150% in our job. Nobody comes to work or should come to work to do 10%, especially those that are coming to work dealing with children. Are there any other questions? No, I just would like to say that I consider this case because it's a first impression in the nature of sui generis, and I appreciate the oral argument today, which the court asked for because the issue is so momentous. I used to prosecute in juvenile court and sat as a juvenile court judge, and this is one of the most difficult dilemmas in the process of protecting young children from dangerous parents. So thank you for your oral argument. Thank you, counsel, for your arguments. We will take the matter under consideration, this position into force, and we will now adjourn.